# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 27, 2011

### STATE OF TENNESSEE v. CHAD ALLEN LOVE

**Appeal from the Circuit Court for Sevier County**
**No. CR 13607-II     Richard R. Vance, Judge**

**No. E2010-01782-CCA-R3-CD - Filed February 8, 2012**

Following a jury trial, the Defendant, Chad Allen Love, was convicted of one count of aggravated robbery. See Tenn. Code Ann. § 39-13-402. In this appeal as of right, the Defendant contends that the evidence was insufficient to sustain his conviction. Following our review, we conclude that the evidence was insufficient to establish the Defendant's identity as the perpetrator of the crime. Accordingly, we reverse and dismiss the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed and Dismissed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Rolfe A. Straussfogel, Sevierville, Tennessee, for the appellant, Chad Allen Love.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James B. Dunn, District Attorney General; and George C. Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On the night of April 19, 2008, Melissa Walker was working as the night shift manager at the McDonald's restaurant on Highway 321 in Gatlinburg. Ms. Walker testified that the night shift consisted of herself and five or six other employees. According to Ms. Walker, the restaurant typically closed at midnight, but it had been exceptionally busy that night and she had personally walked the last customers out around 12:20 a.m. After the last

customers left, Ms. Walker shut down the registers and went into the store's office to "count everything down" while the other employees cleaned the store. Ms. Walker was in the office "counting the money out [and] doing paperwork" when she "heard one of [her] guys yell." Ms. Walker looked out the office door to see "all [her] people being shoved down to the ground right in front of the [] door." Ms. Walker then saw "a guy dressed in dark clothes with a dark hoody, a hat, [and] a bandana over his face." The man was holding what appeared to be a gun and "threw a bag towards [her] and said to put all the money in there so no one would get hurt." Ms. Walker filled the bag with money and the assailant "grabbed it and ran out the back door." Ms. Walker called the police immediately after the assailant ran out the back door.

A short time later, Officer Todd Myers of the Gatlinburg Police Department (GPD) discovered a bag in a creek behind the restaurant. Inside the bag was a second bag and $4,663 in cash. Ms. Walker testified that the bag was the one given to her by the assailant to put the money into. The bag contained all but $167 of the money taken from the McDonald's by the assailant. The next day, the owner of the McDonald's, Justin Israel, was walking along the undeveloped property behind the restaurant when he discovered a black pellet gun. Ms. Walker identified the pellet gun as the one used by the assailant in the robbery. No fingerprints were found on the pellet gun or on the bag and its contents. The police were also unable to find any "usable" fingerprints inside the McDonald's. The creek the bag was found in was approximately six to eight inches deep.

At roll call for the 6:00 a.m. shift on April 20, 2008, the assailant was described as "a black male, skinny build, about six foot [sic]" with "a black sweatshirt and blue jeans," "very distinct" black and white shoes, and "possibly could have a ball cap." Officer Cindy Myers of the GPD testified that she was assigned to patrol the area around the McDonald's that morning. At approximately 7:30 a.m., Officer Myers entered a laundromat located in a shopping center "adjacent to the McDonald's." Officer Myers testified that she checked the laundromat because it was open 24 hours and had "two bathrooms in the back." Officer Myers also testified that the police "checked it periodically for sleepers or people that just slept in there." As Officer Myers entered the laundromat, she spotted "a shoe sticking out from . . . behind an arcade game." Officer Myers "took another step" and saw the Defendant asleep in a chair next to the game. Officer Myers testified that the Defendant "had a black sweatshirt on" with "the hood up" and blue jeans with brown shoes. Officer Myers then exited the building and called for backup.

Officer Luke Walker was also on duty that morning and responded to Officer Myers's call for backup. Officer Walker testified that he led Officer Myers and two other officers in the apprehension of the Defendant because at that time he was "a member of the SWAT team and probably more proficient at tactical entry." Officer Walker patted down the Defendant

and "noticed that . . . his pants were damp and that his shoes were damp as well." Officer Myers testified that when the Defendant walked, his shoes sounded "squishy." Officer Walker testified that the Defendant's wallet "was noticeably soaked wet" and that the Defendant's cell phone was "taken into pieces" and "opened in his pocket like it was there to dry." The officers also found some change on the Defendant, but not the missing $167. The Defendant did not have a baseball cap with him and he was not wearing white shoes. After the Defendant was taken into custody, Officer Walker transported him to the police station. According to Officer Walker, the Defendant told him he had been "at the Party Hut that night and then went to Sunny's to wait for his brother to show up." Officer Walker did not believe the Defendant because at that time, "Sunny's had been closed for about three weeks."

Detective Keith Brackins of the GPD testified that he was the "lead investigator" on this case and that he was at the police station when the Defendant was brought in for questioning. Detective Brackins questioned the Defendant and photographed him. The photographs showed that the Defendant was wearing a dark hooded sweatshirt with a white t-shirt underneath, blue jeans, and navy and grey shoes with metal eyelets. Detective Brackins testified that he seized a "blue white bandana scarf" from the Defendant. However, Detective Brackins admitted that he could not recall where the bandana was found. Detective Brackins also admitted that he did not photograph the Defendant's wallet or his cell phone and that he did not seize anything else from the Defendant. Detective Brackins ultimately released the Defendant that morning because he did not "think [he] had enough to hold him" at that time.

As part of the investigation, Detective Brackins subsequently learned that the Defendant lived at the same address and was the half-brother of one of the employees working at the McDonald's on the night of the robbery, Varion Johnson.[1] Ms. Walker testified that Mr. Johnson had worked at the McDonald's for "a couple of months" prior to the robbery and that he was "just a line worker." Ms. Walker also testified that Mr. Johnson regularly worked the night shift from "4:00 [p.m.] to close" and that Mr. Johnson would be dropped off at work by someone driving a red car. Ms. Walker routinely dropped Mr. Johnson off at a hotel after work so his girlfriend could pick him up. According to Ms. Walker, Mr. Johnson was "on the ground" in front of the office doorway during the robbery. Ms. Walker testified that she dropped Mr. Johnson off at the hotel after the robbery and that

---

[1]Mr. Johnson was the co-defendant in this case and tried with the Defendant. The jury convicted Mr. Johnson of the lesser included offense of facilitation of aggravated robbery. On appeal, this court concluded that the evidence was insufficient to sustain Mr. Johnson's conviction and reversed and dismissed the judgment of the trial court. See State v. Varion Johnson, No. E2010-01363-CCA-R3-CD, 2011 WL 3568275 (Tenn. Crim. App. Aug. 15, 2011).

there was nothing unusual about his behavior except that "everybody was a little jumpy and shaky after what happened." Officer Logan Carr of the GPD testified that he asked Mr. Johnson after the robbery which way the assailant had fled. According to Officer Carr, Mr. Johnson pointed in the opposite direction from the laundromat where the Defendant was found the next morning.

The police were also able to obtain hard drives from the McDonald's containing video surveillance footage of the robbery. Detective Tim Williams of the GPD assisted in the investigation and reviewed the surveillance footage. The video showed Mr. Johnson arriving at the McDonald's at approximately 3:55 p.m. on April 19, 2008. Mr. Johnson is seen getting out of a red car and speaking to a man wearing a hooded jacket. Detective Williams testified that the other man was wearing a "dark colored sweatshirt type hooded." However, the video clearly showed the other man was wearing an unzipped hooded jacket with a white shirt underneath it. Mr. Johnson went into the McDonald's to report for work. The man in the jacket went into the restaurant for a short period of time and then left in the red car.

According to Detective Williams, there was nothing else "relevant to the case" on the surveillance footage until approximately 11:57 p.m. At that time, Mr. Johnson is shown exiting out the back door of the restaurant to take the garbage to the dumpsters. Just before Mr. Johnson exited the restaurant, the outside camera recorded a person wearing a hooded sweatshirt coming out "from a concealed position." The hooded individual stands a few feet from the dumpsters. Detective Williams testified that as Mr. Johnson took the garabage to the dumpsters, the two were "in close proximity" to each other. However, it was indiscernible from the surveillance footage whether the two spoke to each other. The hooded individual appeared to approach Mr. Johnson, but Mr. Johnson did not stop for the individual. The hooded individual then entered the restaurant through one of the customer entrances. After Mr. Johnson finished throwing away the garbage, he reentered the restaurant through the back door. Mr. Johnson then went into the lobby of the restaurant. Detective Williams opined that Mr. Johnson and the hooded individual were "together at that time" because a few minutes passed before either was seen on camera again. However, there were no cameras in the lobby of the restaurant and there was no way to know if Mr. Johnson actually spoke with the hooded individual while they were in the lobby. Likewise, there was no testimony from the other employees regarding any interaction between Mr. Johnson and the hooded individual.

At approximately 12:05 a.m., the hooded individual is seen exiting the restaurant and "returns to [the] alleyway that he'd been seen in previously." A short time later, Mr. Johnson is seen exiting out the same door and going to shut the gates to the dumpsters. Mr. Johnson returned to the customer entrance and appeared to stop and hold the door open for the hooded individual. While the McDonald's normally closed at midnight, Ms. Walker testified that if

someone had come in at 12:06 that night, they would have been served and that she did not lock the doors until 12:20. Detective Williams testified that between 12:05 and 12:31 "[n]othing remarkable" was seen on the video surveillance footage. The police theorized that the hooded individual seen "in close proximity" to Mr. Johnson was the assailant. Detective Williams testified that he believed the assailant was in the restaurant for approximately 25 minutes before the robbery.

At 12:31 a.m., the video surveillance footage showed the assailant behind the service counter walking past the registers towards the kitchen. Detective Williams testified that he "believe[d] the hooded individual either hopped over the counter or came through" the employee entrance. The assailant was wearing a dark hooded sweatshirt, blue jeans, a baseball cap, and a dark bandana over his face. The assailant entered the kitchen, approached some of the employees with the pellet gun, and "grabbed and pointed [the pellet gun] at . . . an employee and pushed him back through the kitchen." The assailant then entered the office, "forcing some [employees] back as he [went]." Ms. Walker complied with the assailant's demands and filled the bag with money. The assailant took the bag from Ms. Walker and ran out the back door at approximately 12:34 a.m.

Detective Williams admitted that he could not determine the identity of the assailant from the surveillance footage. Detective Williams also admitted that he could not determine the color of the assailant's sweatshirt from the footage "other than [to say] it's dark." The surveillance footage also had no sound and had two to three second gaps in the footage due to the formatting of the video. Detective Brackins testified that, in his opinion, the clothes the Defendant was wearing when he was detained "appear[ed] to be the same clothing and shoes" as the assailant had worn in the surveillance footage. However, Detective Brackins admitted that the Defendant had a white t-shirt "hanging out" from underneath his sweatshirt and that the assailant did not.

At trial, Ms. Walker testified that she did not see the assailant's face and that she could not "say who the robber was." Ms. Walker did testify that she believed the bandana found on the Defendant was "just like the one" the assailant wore. Ms. Walker also testified that the clothes the Defendant was photographed in were "just like what the robber was wearing." However, on cross-examination Ms. Walker admitted that she did not notice if the assailant's clothes and bandana were black or blue. Instead she "just knew they were a real dark color." Ms. Walker also admitted that the assailant's clothing was "fairly common." Ms. Walker testified that she did not remember what kind of shoes the assailant was wearing. Detective Brackins testified that Ms. Walker told him the assailant had been wearing white tennis shoes. Ms. Walker testified at trial that the Defendant's "body size" was the same as the assailant's and that the assailant had a "dark" complexion like the Defendant. Ms. Walker testified that she noticed the assailant's complexion because she saw "the palms of

his hands and like the sides of his fingers." The surveillance footage showed that the assailant was not wearing gloves. Ms. Walker admitted that she did not see the "tops" of the assailant's hands and that she did not notice any "distinguishing characteristics" about the assailant's hands. It was established at trial that the Defendant had distinctive tattoos on the tops of his hands and on his fingers. Ms. Walker also admitted she had never seen the Defendant before the day of the trial.

Based upon the foregoing evidence, the jury convicted the Defendant of aggravated robbery. Following a sentencing hearing, the trial court sentenced the Defendant as a Range III, persistent offender to 25 years. The trial court found that the Defendant was a repeat violent offender and ordered that his sentence be served at 100 percent pursuant to Tennessee Code Annotated section 40-35-501(k)(2). The trial court also found that the Defendant committed the offense while on parole for a prior felony and ordered his sentence to run consecutive to the parole violation. See Tenn. R. Crim. P. 32(c)(3). The Defendant filed a timely motion for new trial, which was denied by the trial court, and this appeal followed.

## ANALYSIS

The Defendant contends that the evidence was insufficient to sustain his conviction for aggravated robbery. Specifically, the Defendant argues that there was insufficient evidence to establish his identity as the perpetrator of the crime. The Defendant notes that the State's attempt to establish his identity as the perpetrator was entirely circumstantial and characterizes the State's evidence as "proximity, clothing[,] and a half brother." The Defendant concludes that, based upon the evidence presented at trial, no rational trier of fact could have found that his identity was established beyond a reasonable doubt. The State responds that while the evidence was entirely circumstantial, it "was sufficient for the jury to find that the [D]efendant and his brother coordinated and robbed the McDonald's."

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's

verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Our supreme court recently clarified that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted). Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). Our supreme court has stated that in cases based on circumstantial evidence alone, "the facts and circumstances must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant and must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." Id. (quoting Crawford, 470 S.W.2d at 612-13) (quotation marks and ellipsis omitted). We have no doubt that under this standard, the evidence against the Defendant would be insufficient to establish his identity as the perpetrator. However, Lewter was decided prior to Dorantes and relies on language specifically rejected by our supreme court in Dorantes and its progeny. Accordingly, we will examine this case under the clarified standard announced in Dorantes that circumstantial evidence is equally as probative as direct evidence.

Our supreme court has examined the issue of when circumstantial evidence alone is sufficient to establish a perpetrator's identity several times in recent years. In Sisk, our supreme court examined whether circumstantial evidence was sufficient to establish the defendant's identity as the perpetrator of an aggravated burglary using the Dorantes standard. 343 S.W.3d at 66-68. The court concluded that a hand-rolled cigarette butt containing the defendant's DNA along with corroborative evidence that the defendant lived near the victims' house, was often seen outside smoking, the victims did not smoke, the defendant had never been invited into the victims' house, that it was unlikely the cigarette butt had been tracked into the house, and the defendant's flight from police was sufficient to establish the

defendant's identity as the perpetrator. Id. at 67. Similarly, in Lewter our supreme court concluded that there was sufficient evidence to establish the defendant's identity as the perpetrator of a burglary of a dental office where a shirt with the defendant's DNA was found at the scene, there was evidence "that more than one person was involved in the commission of the crimes," and the defendant was "involved in a close working and social relationship with . . . a self-confessed perpetrator of the burglary." 313 S.W.3d at 748-49. Another example is Rice, where the court found the fact that the defendant was the last person seen with the victim prior to her murder and that the defendant told police he was involved in the victim's murder was sufficient to establish his identity as the murderer. 184 S.W.3d at 662-63.

We believe that this case is distinguishable from Sisk, Lewter, and Rice. There was no evidence that the Defendant was at or near the McDonald's in the hours leading up to the robbery. No one testified as to having seen the Defendant at or near the McDonald's prior to the robbery. Unlike Sisk and Lewter, there was no physical evidence to establish that the Defendant had been in or near the restaurant. There were no usable fingerprints found inside the McDonald's and there were no fingerprints on the pellet gun or the bag used by the assailant. Additionally, there was no evidence that the pellet gun or the bag used in the robbery were in any way connected to the Defendant. The Defendant was found in a laundromat adjacent to the McDonald's, but this was some seven hours after the robbery had taken place. Additionally, the Defendant was not found with a baseball cap or the unrecovered $167. Furthermore, the Defendant denied any involvement in the robbery and told police that he had not been at the McDonald's the night of the robbery. Unlike Lewter, Mr. Johnson, the Defendant's half-brother, was not a confessed co-perpetrator of the crime, but merely an employee of the restaurant. This court has previously held that the fact Mr. Johnson was "in close proximity" to the assailant on two brief occasions prior to the robbery was insufficient to sustain his conviction for facilitation of aggravated robbery. Johnson, 2011 WL 3568275 at *5-6. In fact, the State did not present any evidence that Mr. Johnson and the Defendant had seen each other at all on the day of the robbery.

We believe this case is more akin to the facts in Poole v. State, 467 S.W.2d 826 (Tenn. Crim. App. 1971). In Poole, this court concluded that there was insufficient evidence to establish the defendant's identity as a co-perpetrator of a burglary where the only evidence connecting the defendant to the crime was the fact that he was in the home of the co-defendants, one of which was his sister-in-law, at the time of their arrest. Id. at 829. Some of the stolen items were found at the co-defendants' home, and two eyewitnesses testified that they saw the co-defendants along with a third person driving away from the victim's home a short time after the burglary. Id. at 828. However, the eyewitnesses were unable to identify the third person in the car, and this court concluded that the remaining evidence was insufficient to establish the defendant's identity as the third co-perpetrator. Id. Similarly in

the present case, Ms. Walker testified that she could not identify the assailant and that she had never seen the Defendant prior to trial. Detective Williams testified that the assailant could not be identified from the video surveillance footage. The State's case was based upon the Defendant's proximity to the McDonald's when he was detained, the general similarity of his clothes to the assailant's, and his relationship with Mr. Johnson, who was exonerated from any involvement in the crime. Based upon this court's holding in Poole, we conclude that the Defendant's proximity to the McDonald's seven hours after the robbery and his relationship with Mr. Johnson are insufficient to sustain his conviction. We must now determine whether any similarity of the Defendant's clothing to the assailant's, when considered with the location of the Defendant's arrest and his relationship to Mr. Johnson, was sufficient to establish his identity beyond a reasonable doubt.

Ms. Walker testified that the Defendant's clothing and bandana were "just like" the assailant's. However, Ms. Walker could not recall if the assailant's clothing was black or blue, and she admitted that the assailant's clothing was "fairly common." Ms. Walker also testified that she could not remember what kind of shoes the assailant had worn, but she told Detective Brackins that they were white tennis shoes. Police officers were informed that the assailant was wearing "very distinct" black and white shoes. However, the Defendant was found wearing navy and grey shoes. Ms. Walker testified that the Defendant had the same "body size" and complexion as the assailant. However, Ms. Walker also testified that she did not notice anything distinctive about the assailant's hands. The Defendant had distinctive tattoos on the top of his hands and fingers. While the assailant was not wearing gloves, it is indiscernible from the surveillance footage if he had any tattoos on his hands. Ms. Walker's description of the assailant only "matched" the Defendant in its most general terms. When pressed for more detailed information regarding the description of the assailant, Ms. Walker was vague and could not recall any significant identifiers.

The State also contends that the fact that the Defendant's pants, shoes, wallet, and cell phone were damp when he was found connected him to the robbery. The State suggests that this was because the Defendant had fallen in the creek behind the McDonald's and dropped the bag of money. However, this inference is based exclusively on the fact that the Defendant was found the next morning in a building near the McDonald's and the notion that his pants, shoes, wallet, and cell phone would still be damp some seven hours after falling into an eight-inch deep creek. Even viewing all reasonable inferences in favor of the State, we cannot conclude that any rational trier of fact could have found the Defendant's identity as the perpetrator established beyond a reasonable doubt. To connect the Defendant to the robbery one must rely solely on theory and supposition and not on credible evidence. Accordingly, we reverse and dismiss the judgment of the trial court.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we reverse and dismiss the Defendant's conviction for aggravated robbery.

_____
D. KELLY THOMAS, JR., JUDGE